# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NORTHEAST DIVISION

| | | |
|---|---|---|
| **BUCK MOUNTAIN COMMUNITY ORGANIZATION, an unincorporated association, BOWER JOHNSTON, and HAROLD BOSWELL,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) | **No. _____** |
| **TENNESSEE VALLEY AUTHORITY,** | ) ) ) | |
| **Defendant.** | ) | |

---

## COMPLAINT
---

### STATEMENT OF THE CASE

1.     This is an action for declaratory judgment and preliminary and permanent injunctive relief against the further planning, design, property acquisition and construction by Defendant Tennessee Valley Authority ("TVA") for the Algood 161 kV transmission line in Putnam County, Tennessee ("Project").

2.     TVA would take permanent easements by eminent domain from property owners and clear a 100-foot wide swath along the 5.5 mile route of the proposed transmission line, build access roads for construction, cross Falling Water River, a protected stream, and erect numerous 75-to-100 foot steel poles for power lines in an area of hardwood forest, caves, springs, residences, and farms along Buck Mountain.  The transmission line would destroy 35.2 acres of forest, impact habitat for the endangered Indiana bat and for the cerulean warbler, a candidate

species for listing under the Endangered Species Act, and require the long-term use of herbicides to kill woody vegetation all along the right of way.

3.     As set forth in detail below, TVA has failed to comply with and has planned for the design, construction and property acquisition for the Project in violation of the requirements of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4331, *et seq.*, and applicable implementing regulations, by preparing an inadequate and erroneous Environmental Assessment ("EA"), by failing to prepare and circulate for public review an Environmental Impact Statement ("EIS") concerning the Project, and by making the arbitrary and capricious Finding of No Significant Impact ("FONSI") for the Project contrary to the information and data available.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (Federal Question), 28 U.S.C. §§ 2201-02 (Declaratory Judgment), and 5 U.S.C. §§ 701-06 (Administrative Procedures Act).

5.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because Plaintiffs reside in the District and the location of the Project is in the District.

## PARTIES

6.     Plaintiff Buck Mountain Community Organization ("BMCO") is an unincorporated association with members throughout the Buck Mountain Community. Members of Buck Mountain Community Organization own property that will be directly impacted by the proposed transmission line, including property that will be taken as part of the right of way and property that will be affected by having the transmission line in close proximity, impairing the

- 2 -

views from the property and resulting in impacts from right of way maintenance, such as herbicide spraying and reduction in wildlife habitat. Unless the relief requested is granted, the interests of members of Buck Mountain will be directly and substantially impacted.

7.     Plaintiff Bower Johnston is a resident of Putnam County, Tennessee who lives at 198 Parragon Road, Cookeville, Tennessee 38506. Mr. Johnston owns 20.2 acres at this location. The Project will place the transmission line within 200 feet of Mr. Johnston's home, and will cut a 100 foot wide easement through almost an acre of his property.

8.     Plaintiff Harold Boswell is a resident of Putnam County, Tennessee who lives at 1600 J. Boswell Road, Monterey, Tennessee 38574. Mr. Boswell owns approximately 90 acres, Map and Parcel No. 051 003800, that are directly in the path of the transmission line. The Project will affect place the transmission line directly through the property. The easement will be 2457 feet long, cover 5.64 acres and cut a 100 foot wide easement through the middle of the Mr. Boswell's property.

9.     Defendant TVA is a corporation created by federal law whose headquarters is located in Knoxville, Tennessee. TVA is the federal corporation responsible for the planning, design, property acquisition and construction of the Project. TVA is considered a federal agency pursuant to NEPA.

## GENERAL ALLEGATIONS

10.    Defendant has proposed to build a new 5.5 mile long 161 kV electric transmission line across Buck Mountain in Putnam County, Tennessee, to supply a new Algood substation being built by the Upper Cumberland Electric Membership Corporation.

11.    TVA prepared a Draft Environmental Assessment for the Project for which a public notice was given on November 29, 2007.  A thirty-day comment period was provided for written comments, which was extended an additional two weeks.  No public hearing was held.

12.    The Final EA was approved on May 8, 2008.  On that date, Daniel H. Ferry, a Senior Manager for TVA signed a "Finding of No Significant Impact" for the Project.

13.    Defendant has not prepared an Environmental Impact Statement for the Project, and has instead relied upon the Final EA and FONSI to authorize the construction of the Project.

### <u>Purpose and Need for the Project</u>

14.    The claimed need for the project, as discussed in the Final EA, has three components:

   a. TVA's West Cookeville 161 kV substation transformer bank is projected to be above its calculated capability by summer 2008.

   b. UCEMC's Algood 69 kV substation is projected to be above its firm capability by summer 2008.

   c. TVA's West Cookeville-East Cookeville-Algood 69 kV transmission line will exceed its capability by summer 2008.

15.    Defendant has not provided to the public or to BMCO data that supports the need for the project.

16.     In response to a Freedom of Information Act request, Defendant provided BMCO with two documents that supposedly support these three components: "One Ownership Study: Upper Cumberland EMC Algood Substation, PowerTech Engineering, LLC (July 2006)" and "Project Justification Data Algood, Tennessee 161 kV Substation, Upper Cumberland Electric Membership Corporation (UCEMC) Provide 161 kV Delivery Point (W0693)."  Neither of these documents supports a need for the proposed new transmission line.

17.     Both documents rely on projected additions to the loads for the Algood substation of approximately 7.8 MVA to justify the three components of the need.  These new load projections were described in general in the documents, but their specific descriptions were redacted from the documents provided to BMCO.  Defendant has admitted in its Responses to Comments, Addendum A to the Final EA, that there is no basis for these projected new loads.

18.     Defendant does not describe the basis for its load projections in the Final EA's need section.  Defendant merely states the numbers of projected need and gives a vague description of its "projections."

19.     Defendant's numbers show that is still relying on 7.8 MVA (megavolt ampere) of projected added load from the Algood area for which there is no basis.

20.     Further, in the Final EA, Defendant did not take into account the reduction in the need for a new substation and transmission line which would be caused by an annexation of customers by Cookeville Electric, nor the already planned reintegration of the UCEMC system after the planned annexation of customers by Cookeville Electric.

21.     The evaluation of purpose and need in the Final EA fails to consider the annexation of UCEMC customers by the City of Cookeville and the court-approved UCEMC

reintegration plan, both of which contradict the need for the proposed new Algood substation and transmission line.

22.     Cookeville has annexed 16 areas served by UCEMC since 2003, including nine areas that have been the subject of a federal court challenge by UCEMC and involved 5,631.4 acres and approximately 1,170 UCEMC customers. The U.S. District Court for the Middle District of Tennessee and the U.S. Court of Appeals for the Sixth Circuit upheld the authority of Cookeville to annex the nine areas, which include areas served by the Algood substation, and approved a reintegration plan submitted by UCEMC to reconfigure its system once Cookeville begins serving the annexed areas. *City of Cookeville, Tennessee v. Upper Cumberland Electric Membership Corporation,* 360 F. Supp. 2d 873 (M.D. Tenn. 2005), *City of Cookeville, Tennessee v. Upper Cumberland Electric Membership Corporation*, et al., 484 F. 3d 380 (6th Cir. 2007).

23.     Cookeville has an approved Urban Growth Boundary that would permit the city to annex additional areas now served by UCEMC.  Some of these areas would contain UCEMC customers currently served by the Algood substation who would be shifted to Cookeville facilities, further reducing demand on the Algood substation.

24.     The planned new facilities included in the UCEMC reintegration plan approved by this Court further contradict the need for a new Algood substation and TVA transmission line as proposed in the Final EA.  The reintegration plan would accomplish one of the stated needs in the Final EA by removing UCEMC loads from the TVA West Cookeville substation.

## Alternatives to the Project

25.     NEPA requires agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). NEPA regulations require that "Federal agencies shall, to the fullest extent possible: [u]se the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment." 40 C.F.R. § 1500.2(e). The purpose of this analysis is to "provid[e] a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14; see also 42 U.S.C. § 4332(2)(E); 40 C.F.R. §§ 1507.2(d), 1508.9(b).

26.     Defendant did not adequately assess alternatives to the Project, including the no-build alternative. Defendant's stated purpose and need in the Final EA for the Project does not consider other alternatives for reducing loads on Defendant's West Cookeville 161 kV substation, the existing Algood substation, and the existing transmission line.

27.     The Final EA does not comply with NEPA requirements, because it does not address several reasonable alternatives that will accomplish the project purposes without building any new transmission line with its attendant adverse environmental impacts. According to the Final EA, the only alternative to Defendant building a new transmission line is for UCEMC to build the same transmission line. The Final EA dismisses out of hand any no-build alternative, including both conservation and distributed generation as a means of reducing the projected loads that are cited as the basis for the proposed project.

- 7 -

28. BMCO proposed alternatives in its comments to Defendant's Draft EA, including:

   a. Cookeville Electric's proposal to TVA to shift approximately 16 MVA of load to the underutilized South Cookeville substation that receives electricity directly from TVA's 161 kV transmission line, not through West Cookeville or East Cookeville;

   b. Reliance upon the existing Algood substation with the loads reduced as a result of Cookeville's annexation;

   c. Use of an existing and unutilized 8 MW diesel generator currently located at Tennessee Technological University and connected to the West Cookeville substation to reduce peak loads on the West Cookeville substation; and

   d. The UCEMC reintegration plan approved by the U.S. District Court for the Middle District of Tennessee in UCEMC's challenge to Cookeville's annexation of nine areas served by UCEMC, which includes a new substation built under TVA's 161 kV line northwest of Cookeville and feeding a loop around Cookeville, including the Algood substation, using existing poles and rights of way.

29. Defendant either dismissed these alternatives with little consideration or did not consider them at all. Defendant did not provide a valid reason why these alternatives cannot be implemented as quickly as the proposed 5.2 mile long transmission line and new Algood substation. Each of these alternatives are likely to be cheaper than the proposed project, and are not likely to have as great an environmental impact as the current plan to build a transmission line.

- 8 -

30.     Defendant did not adequately assess the no-build alternative, but merely stated that "UCEMC could decide to build a new transmission line to serve its new substation" and discussed what may happen if a system is overloaded.  There was no assessment of whether such an overload would definitely occur.

31.     Defendant did not adequately assess the alternative of using another Cookeville substation.   In discussing redistributing power supply, its only apparent concern was that redistribution of power among different substations would involve shifting customers between two competing power suppliers.  Defendant then stated that "this could involve the replacement of existing distribution lines or the construction of new lines, which would be the responsibility of CED and UCEMC, rather than TVA."  However, there was no evaluation of whether any of these things would actually have to occur.

**Alternative Routes**

32.     Defendant did not adequately evaluate the alternative routes for the proposed line with a transparent scientific methodology in the Final EA.  Defendant eliminated all routes except for Alternate 1 from consideration before assessment of alternatives in the Final EA. These alternative routes were established and eliminated using a subjective methodology which included a mixture of engineering, environmental, land use, and cultural criteria.  Although the considerations for each type of criteria were explained in the Final EA, there was no basis provided for how any of the routes were established, why others were not considered, how specific indicators for the four types of criteria were chosen, for how scores were assigned to each of the routes for these indicators, how these scores were summed to generate an overall

Case 2:08-cv-00040   Document 1   Filed 05/20/08   Page 9 of 22 PageID #: 9

score for each route, and how the different criteria were weighted in comparing routes (e.g., how environmental criteria were balanced with engineering criteria).

33. There was little basis provided for how the alternative routes were established. All of the alternative routes except the "preferred alternative" – the current route – were fairly similar and were routed through Booger Swamp which contains protected wetlands. Neither the right of way for the existing transmission line to the Algood substation nor the straightest and widest highway right of way (Highway 111) was evaluated in the matrix or the Final EA.

34. When asked to supply any further information about the matrix of siting criteria used, TVA referred BMCO to the "Fact Sheet" on its website for the project and did not supply any comparison matrix, list, or chart. The "Fact Sheet" provided by TVA as the basis for its selection of the preferred route does not adequately explain or document the use of a methodology for selecting the preferred route. For each of the types of criteria "opportunities and constraints" were selected, but the Fact Sheet does not explain how these particular indicators of opportunities and constraints were selected from among the universe of indicators that could be applied to transmission line siting.

35. Defendant ranked its routes before performing any field review. Some of the conclusions used to rank Alternative 1 as preferred compared to the others have been contradicted by the field data.

36. Defendant has implicitly expressed environmental preferences without scientific justification in its use of this ranking system. For instance, Defendant clearly prefers routes that avoid wetlands as compared to routes that avoid destroying forest. It is likely that the route through wetlands, however, would have less overall acreage impacts on wetlands vegetation than the route through forests would have on forest vegetation, because in wetlands the only

- 10 -

permanent clearing that would need to be done is for the power poles themselves. Wetlands vegetation in this area does not achieve heights that would threaten the transmission lines. In comparison, with the current route, a 100-foot wide swath of forest will be permanently destroyed.

37.     Defendant implicitly expressed preferences regarding land use constraints, selecting as preferred the route that crosses the fewest parcels of land. The preferred route crosses only two fewer parcels than the Alternatives 11 and 12, making the distinction meaningless.

38.     Section 2.3.5 of the Final EA states that "[e]valuation of the alternative routes for the number of road crossings and existing transmission lines affected resulted in no major constraints along any of the alternative routes." If all of the routes were feasible from an engineering standpoint, then they all should have been evaluated in the Final EA for their relative environmental impacts.

## Environmental Impacts

39.     The construction of the transmission line would result in the destruction of over 35 acres of forest, which is habitat for the Indian bat (*Myotis sodalist*; Gray bat (*Myotis grisescens*; listed Endangered federally and in Tennessee); Carolina northern flying squirrel (*Glaucomys sabrinus coloratus*; listed Endangered federally and in Tennessee); Northern Pine Snake (*Pituophis melanoleucus melanoleucus*; listed Threatened in Tennessee); Bachman's sparrow (*Aimophila aestivalis*; listed Endangered in Tennessee); Allegheny woodrat (*Neotoma magister*; listed Deemed in Need of Management in Tennessee); Masked shrew (*Sorex cinereus*; listed Deemed in Need of Management in Tennessee); Meadow jumping mouse (*Zapus*

*hudsonius*; listed "Deemed in Need of Management" in Tennessee); Rafinesque's big-eared bat (*Cornorhinus rafinesquii*; listed Deemed in Need of Management in Tennessee); and Cerulean Warbler (*Dendroica cerulean***;** listed "Deemed in Need of Management" in Tennessee). This area is also contains several specimens of Least Trillium (*Trillium pusillum*), a plant which is listed as Endangered in Tennessee.

40.     The Project will significantly impact the environment by:

   a.   Clearing a 100-foot wide swath along the 5.5 mile route of the proposed transmission line;

   b.   Removing 35.2 acres of forest;

   c.   Cutting large trees outside the 100-foot wide swath deemed by TVA to interfere with power lines;

   d.   Building access roads for construction,

   e.   Crossing Falling Water River, a protected stream, and

   f.   Erecting numerous 75-to-100 foot steel poles for power lines in an area of hardwood forest, caves, springs, residences, and farms along Buck Mountain;

   g.   Impacting habitat for multiple endangered and threatened species; and

   h.   Requiring the long-term use of herbicides to kill woody vegetation all along the right of way.

41.     Defendant's justification for the Project is flawed, because it relies upon inaccurate information. Defendant's field assessments were hastily completed, only assessed species that were present in August and September, and were not geared towards locating all the endangered and threatened species that are known to exist in the area. Yet, Defendant claims

- 12 -

"[n]o federally listed as threatened or endangered plants are known to occur on the proposed right-of-way."

42.     Defendant does not consider in the Final EA the Cumulative Impact of the Project.  CEQ Guidelines 40 C.F.R. § 1508.7 state:

> "Cumulative impact" is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

43.     Defendant's Project will destroy 35.2 acres of hardwood trees will result in significant erosion and the destruction of critical habitat.  Mature hardwoods are located on the side of Buck Mountain.  Removing the natural protection of the mountain will leave it bare to the elements and erosion will likely be immediate whether it is accomplished through wind or rain. Trees such as the shagbark hickory (*Carya ovate*) provide homes for bats and other creatures.  If a significant number of these trees are removed, the habitat for some threatened and endangered creatures will be immediately diminished.

44.     Defendant's survey of the area took place during August and September 2007, and has not completed an adequate assessment of the vegetation in the area.  However, Section 4.1.2 of the Final EA states:

> Adoption of the Action Alternative would not significantly affect the vegetation of the region.  Adoption of this alternative would require clearing of about 35.2

- 13 -

acres of forest including over 10 acres of minimally disturbed oak-hickory and mesic forest located between the substation and Parragon Road.

45.     Without an adequate assessment of the current baseline, TVA would not be able to state how much impact the vegetation of the region would suffer.  There is no way to determine, for instance, if the Least Trillium is located within the proposed transmission line corridor, or if it is located safely outside of the corridor.   Further, Defendant has not assessed the affect that the addition of herbicides and other toxins will have on the vegetation of the region.

46.     Defendant's Project has been the center of much controversy and is opposed by many persons who would be served by the power line.

47.     In an effort to thwart objection to its decision, Defendant began the process of constructing the Project in May 2008 immediately after publishing the Final EA, as well as beginning eminent domain proceedings to take an easement across the property of members of Plaintiff BMCO.

## STATUTORY AND REGULATORY FRAMEWORK

### National Environmental Policy Act

48.     NEPA makes environmental protection a part of the mandate of every federal agency and department, and is the "basic national charter for protection of the environment," 40 C.F.R. § 1500.1(a).  Its purpose is "to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment."  40 C.F.R. § 1500.1(c).

49.     To accomplish this purpose, NEPA requires that all federal agencies prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the

human environment." 42 U.S.C. § 4332(C). This statement, known as an Environmental Impact Statement, must describe, among other items, the "environmental impact of the proposed action," any "adverse environmental effects which cannot be avoided should the proposal be implemented," and less environmentally harmful alternatives to the proposal. 42 U.S.C. § 4332. Applicable regulations significantly restrict or preclude agency actions concerning proposed projects during the NEPA EIS process. 40 C.F.R. § 1506.1.

50. To determine "significance" (and thus whether an EIS must be prepared), the agency must consider both the context and intensity of the proposed action, including whether the project will take place in wetlands or other "ecologically critical areas" and whether endangered species will be affected. 40 C.F.R. § 1508.27. In addition, the agency must consider "the degree to which the action is related to other actions with . . . *cumulatively significant impacts* . . . ." *Id.* (emphasis added).

51. Cumulative impacts are impacts on the environment which result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time. 40 C.F.R. § 1508.7.

52. To determine whether this significance threshold is met, the agency may prepare an Environmental Assessment. Based on the EA, a federal agency either decides to prepare an EIS or makes a Finding of No Significant Impact. 40 C.F.R. § 1501.4.

53. An EA must "provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or finding of no significant impact." 40 C.F.R. § 1508.9(a)(1); *see* 40 C.F.R. § 230.11.

- 15 -

54.     Guidelines promulgated by the Council on Environmental Quality ("CEQ Guidelines") at 40 C.F.R. § 1501.4 provide criteria for determination of whether an environmental impact statement should be prepared by a federal agency.   First, under subparagraph (a), the agency must "determine under its procedures supplementing these regulations (described in § 1507.3) whether the proposal is one which:  (1) Normally requires an environmental impact statement, or (2) Normally does not require either an environmental impact statement or an environmental assessment (categorical exclusion)."

55.     The CEQ Guidelines at 40 C.F.R. § 1508.27 define "significantly" for purposes of NEPA as follows:

"Significantly" as used in NEPA requires considerations of both context and intensity:
    (a) Context.  This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality.  Significance varies with the setting of the proposed action.  For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole.  Both short- and long-term effects are relevant.
    (b) Intensity.  This refers to the severity of impact.  Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action.  The following should be considered in evaluating intensity:
        (1) Impacts that may be both beneficial and adverse.  A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.
        (2) The degree to which the proposed action affects public health or safety.
        (3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.
        (4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.
        (5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.
        (6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

- 16 -

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

56.     TVA has published Procedures for Compliance with the National Environmental Policy Act. Paragraph 5.4.1 states that the "following actions normally will require an environmental impact statement:

1. Large water resource development and water control projects.
2. Major power generating facilities.
3. Uranium mining and milling complexes.
*4. Any major action, the environmental impact of which is expected to be highly controversial.*
*5. Any other major action which will have a significant effect on the quality of the human environment"* (emphasis added).

## Administrative Procedure Act

57.     The Administrative Procedure Act ("APA") provides that any agency action which is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" is prohibited and may be overturned by a district court. 5 U.S.C. § 706(2)(A). TVA is a federal agency required to comply with this APA prohibition.

58.     TVA's issuance of an EA and a FONSI are "agency actions" subject to judicial review under the APA.

- 17 -

## SPECIFIC ALLEGATIONS

### COUNT I: VIOLATION OF NEPA
### FAILURE TO ANALYZE ALTERNATIVES

59.     Plaintiff incorporates the allegations of paragraphs 1 through 58 of this Complaint as though fully set forth.

60.     NEPA requires agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). NEPA regulations require that "Federal agencies shall, to the fullest extent possible: [u]se the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment." 40 C.F.R. § 1500.2(e).  The purpose of this analysis is to "provid[e] a clear basis for choice among options by the decisionmaker and the public."  40 C.F.R. § 1502.14; see also 42 U.S.C. § 4332(2)(E); 40 C.F.R. §§ 1507.2(d), 1508.9(b).

61.     Defendant's stated purpose and need in the Final EA for the Project does not consider other alternatives for reducing loads on Defendant's West Cookeville 161 kV substation, the existing Algood substation, and the existing transmission line.

62.     Defendant's Final EA does not comply with NEPA requirements, because it does not address several reasonable alternatives that will accomplish the project purposes without building any new transmission line with its attendant adverse environmental impacts.

63.     According to Defendant's Final EA, the only alternative to Defendant building a new transmission line is for UCEMC to build the same transmission line.  The Final EA dismisses out of hand any no-build alternative, including both conservation and distributed

- 18 -

generation as a means of reducing the projected loads that are cited as the basis for the proposed project.

**COUNT II: VIOLATION OF NEPA**
**FAILURE TO PREPARE AN EIS**

64.     Plaintiff incorporates the allegations of paragraphs 1 through 58 of this Complaint as though fully set forth.

65.     The Project is a "major Federal action significantly affecting the quality of the human environment" within the meaning of Section 102(2)(c) of NEPA, 42 U.S.C. § 4332(2)(c), the TVA procedures for implementing NEPA, and the CEQ Guidelines, 40 C.F.R. Part 1500.

66.     Under NEPA, 42 U.S.C. § 4332(2)(c), the TVA procedures implementing NEPA, and the CEQ Guidelines, 40 C.F.R. Part 1500, Defendant was required to prepare and circulate an Environmental Impact Statement concerning the Project, because it is a major action, the environmental impact of which is expected to be highly controversial.

67.     The Project requires the preparation of an EIS under TVA procedures and the CEQ Guidelines, 40 C.F.R. Part 1500, because it is major action which will have a significant effect on the quality of the human environment.

**COUNT III: VIOLATION OF NEPA**
**ARBITRARILY NARROW STATEMENT OF PURPOSE AND NEED**

68.     Plaintiff incorporates the allegations of paragraphs 1 through 58 of this Complaint as though fully set forth.

69.     Defendant's stated purpose and need in the Final EA for the Project is arbitrarily narrow.

- 19 -

70.     Defendant's Final EA makes it clear that Defendant did not consider other alternatives for reducing loads on Defendant's West Cookeville 161 kV substation, the existing Algood substation, and the existing transmission line.

71.     Unless Defendant are enjoined from further planning, financing, contracting property acquisition, and construction for the Project in violation of NEPA and applicable rules, Plaintiff will be irreparably damaged.


### COUNT IV: VIOLATION OF NEPA
### RELIANCE ON INCOMPLETE AND INACCURATE DATA AND INFORMATION

72.     Plaintiff incorporates the allegations of paragraphs 1 through 58 of this Complaint as though fully set forth.

73.     The EA prepared for the Project by the Defendant was inadequate and did not comply with NEPA.

74.     Defendant has violated and is violating NEPA, 42 U.S.C. § 4332(2)(c), TVA procedures for implementing NEPA, and the CEQ Guidelines, 40 C.F.R. Part 1500, by preparing and relying upon an inadequate, arbitrary and capricious Environmental Assessment for the Project and by issuing a Finding of No Significant Impact that is erroneous, arbitrary and capricious.

75.     Defendant has violated and is violating NEPA, 42 U.S.C. § 4332(2)(c), TVA procedures for implementing NEPA, and the CEQ Guidelines, 40 C.F.R. Part 1500, by proceeding with planning, financing, property acquisition, and construction for the Project without preparing and circulating an EIS and instead have relied upon an inadequate

Environmental Assessment and an erroneous, arbitrary and capricious Finding of No Significant Impact.

76.     Unless Defendant is enjoined from further planning, financing, contracting property acquisition, and construction for the Project in violation of NEPA and applicable rules, Plaintiff will be irreparably damaged.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request this Court to grant the following relief:

1.     Enter a declaratory judgment declaring unlawful the Defendant' planning, financing, contracting, property acquisition and construction for the Project as violations of NEPA, 43 U.S.C. § 4332(2)(c), TVA regulations implementing NEPA, 33 C.F.R. Part 230, and the CEQ Guidelines, 40 C.F.R. Part 1500, and APA § 706(2)(A), 5 U.S.C. § 706(2)(A);

2.     Enter a preliminary injunction enjoining Defendant from proceeding with the planning, financing, contracting, property acquisition and construction for said Project pending the trial of this action;

3.     Enter a permanent injunction enjoining Defendant from proceeding with the planning, financing, contracting, property acquisition and construction for said Project until Defendant have caused to be prepared and circulated for public and interagency comment an adequate Draft and Final Environmental Impact Statement identifying and discussing in detail the environmental impacts of and the alternatives to the proposed Project in accordance with NEPA, 43 U.S.C. § 4332(2)(c), TVA regulations for implementing NEPA, 33 C.F.R. Part 230, and the CEQ Guidelines, 40 C.F.R. Part 1500;

4.    Enter an order awarding Plaintiff reasonable attorney's fees, interest, and costs incurred in this action, pursuant to the Equal Access to Justice Act, 5 U.S.C. § 504, and other applicable laws; and

5.    Issue such other and further relief as this Court deems just and appropriate.

/s/Gary A. Davis
Gary A. Davis (Tenn. BPR No. 009766)
*gadavis@enviroattorney.com*
Rebecca C. Kaman (Tenn. BPR No. 022870)
*bkaman@enviroattorney.com*
GARY A. DAVIS & ASSOCIATES
61 N. Andrews Avenue
P.O. Box 649
Hot Springs, NC  28743
(828) 622-0044

Brian Paddock (Tenn. BPR No. 006968)
PADDOCK & MASTIN
360 Roberts Hollow Lane
Cookeville, TN 37214
(931) 268-2938
ATTORNEYS FOR PLAINTIFFS