## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## NORTHEASTERN DIVISION

**BUCK MOUNTAIN COMMUNITY** )
**ORGANIZATION,** )
**an unincorporated association,** )
**BOWER JOHNSTON,** )
**and HAROLD BOSWELL,** )
                                                          )
      **Plaintiffs,** )
                                                           )
**v.** )      **Case No. 2:08-cv-0040**
                                                           )      **Judge Trauger**
**TENNESSEE VALLEY AUTHORITY,** )
                                                           )
      **Defendant.** )

## MEMORANDUM

Pending before the court is the defendant's Motion to Dismiss and for Summary Judgment (Docket No. 44), to which the plaintiffs have responded (Docket No. 57), and the defendant has replied (Docket No. 61). Also pending is the plaintiffs' Motion for Summary Judgment (Docket No. 48), to which the defendant has responded (Docket No. 53), and the plaintiffs have replied (Docket No. 60). In considering those motions, it appeared to the court that the plaintiffs' claims may be moot, and the court ordered the parties to file supplemental briefs addressing the mootness issue, which they did. (Docket Nos. 67 and 68.)

For the reasons discussed herein, the court finds that the plaintiffs' claims are not moot but that the defendant is entitled to summary judgment with respect to all of the plaintiffs' claims.

## BACKGROUND

In this case, the court is called upon to review the decision of the defendant, Tennessee Valley Authority ("TVA"), to construct a 5.5-mile 161-kV transmission line connecting TVA's existing transmission system to a new 161-kV electric substation built by the Upper Cumberland Electric Membership Corporation ("UCEMC") in Algood, Putnam County, Tennessee.[1] Construction of the new transmission line required the taking, by eminent domain, of permanent easements from certain property owners, the construction of access roads, and the erection of numerous steel poles for power lines in an area of hardwood forest, caves, springs, residences, and farms along Buck Mountain. The plaintiffs in this matter are Buck Mountain Community Organization, an unincorporated association with members in the Buck Mountain Community whose property is directly affected by the new transmission line, and Bower Johnston and Harold Boswell, individuals who are residents of Putnam County and whose property is directly affected by the new transmission line.

In 2006, UCEMC informed TVA that it planned to build a new 161-kV electric substation in Algood, Tennessee and requested that TVA provide a new 161-kV transmission line to connect the planned new Algood substation to TVA's existing transmission system. To that end, UCEMC submitted to TVA a study, entitled "One Ownership Study, Upper Cumberland EMC, Algood Substation," purporting to justify the need for both the new substation and for a new transmission line connecting the new substation to TVA's existing transmission system. In response to UCEMC's request, TVA established a web site containing

_____

[1]Unless noted otherwise, the facts are drawn from TVA's Response to Statement of Undisputed Facts in Support of Plaintiffs' Motion for Summary Judgment (Docket No. 56), Plaintiffs' Response to Defendant's Statement of Material Facts (Docket No. 57 Ex. 1), and the related exhibits and other materials submitted by the parties.

information about the proposed transmission line, a map of alternative routes, and feedback

mechanisms.  TVA also conducted its own study of need, entitled "Project Justification Data,

Algood, Tennessee 161-kV Substation, Upper Cumberland Electric Membership Corporation

(UCEMC), Provide 161-kV Delivery Point."

On February 6, 2007, TVA held an open house in Algood, Tennessee to address the need

for the proposed transmission line, alternative route locations, the potential impacts of the

proposed transmission line on residential and commercial development, health, the environment,

and cultural resources.  Approximately 175 people attended the open house, which was followed

by a public comment period.

TVA released a draft Environmental Assessment ("EA") on November 23, 2007.  In the

course of a subsequent comment period, TVA received sixty-nine comments from forty-five

different individuals and organizations, including the plaintiffs, regarding the draft.

Additionally, the plaintiffs submitted a report prepared by Peter Lanzalotta (the "Lanzalotta

Report") that contained another analysis of the need for the project.  On May 8, 2008, TVA

issued a final EA and a Finding of No Significant Impact, concluding that it was not required to

prepare an Environmental Impact Statement ("EIS").  The EA is a substantial document,

comprising over ninety pages, seven appendices, and two addenda.[2]

The EA states that TVA "is proposing to supply electric power to [the planned new

Algood] substation by building approximately 5.5 miles of new 161-kilovolt (kV) transmission

line (i.e., a 'tap line') that would connect the planned substation to TVA's existing West

---

[2]The EA was filed previously in conjunction with the parties' briefing of the plaintiffs'
request for a preliminary injunction.  (*See* Docket No. 3 Exs. 2-5.)

3

Cookeville-Peavine Transmission Line."[3]  The EA articulates three reasons as to why the project is necessary: the fact that the existing West Cookeville 161-kV substation, which is the primary power source for the Cookeville and Algood area, was projected to be above capacity by summer 2008; the fact that the existing Algood 69-kV substation was projected to be above capacity by summer 2008; and the fact that the existing West Cookeville-East Cookeville-Algood 69-kV transmission line was projected to be above capacity by summer 2008.  In considering the need for the project in the EA, TVA evaluated historical load data, including summer load data from 2007 that was not available at the time it issued the draft EA.  TVA concluded that, without a new transmission line to connect UCEMC's planned new Algood substation to TVA's existing transmission system, the system would be at "a high risk of interruption," particularly during periods of high usage, that this risk was projected to increase over time, and that the system could face overloads "as early as summer 2008."

In a chapter entitled "Alternatives Including the Proposed Action," the EA discusses, at length, two alternatives: the "No Action Alternative" and the "Action Alternative."  Under the "No Action Alternative," TVA would not construct the proposed transmission line, and the system "would continue to operate with a high risk of interruption in certain situations."  Under the "Action Alternative," TVA would construct the proposed transmission line, which would "provide service to UCEMC's planned substation, would help meet the growing electric power needs in the Algood area, and would improve the reliability of the Algood power supply."  The EA also discusses, in addition to these two alternatives, a number of other alternatives that TVA

_____

[3]Needless to say, the plaintiffs dispute the basis for many of the conclusions reached by TVA in the EA.  Those arguments, however, will be addressed later.  The following overview simply outlines the relevant contents of the EA.

4

had considered but ruled out for a variety of considerations.  Moreover, the EA discusses the process by which TVA identified and evaluated possible routes for the proposed transmission line and identifies a route referred to as "Alternative Route 1" as that with the least impact overall.  After describing the No Action and Action Alternatives to the project and the various alternative routes, the EA concludes that the Action Alternative is TVA's "preferred alternative" and that Alternative Route 1 is its "preferred route."  The EA states that, if the proposed transmission line were not constructed, the existing infrastructure "would likely become overloaded in the short term," which would "lead to equipment failures and outages with brownouts and blackouts in the area," reducing the reliability of the transmission system to "unacceptable levels."

The EA acknowledges that construction of the proposed transmission line would result in certain "unavoidable adverse impacts," including "the loss of [over thirty-five acres of] forest area and associated wildlife populations; increased forest fragmentation; removal of the tree canopy at stream crossings; restrictions on future land use within the right-of-way; and changes to the visual character within the local area."  The EA further specifies the particular environmental conditions that could be affected by the project, including terrestrial wildlife and vegetation, aquatic life, threatened and endangered species, surface water, groundwater and geology, flood plains, wetlands, natural areas, historical and archaeological resources, visual and aesthetic quality, recreation, and socioeconomics.  The EA evaluates the consequences of the project on those environmental conditions and concludes that the project would not result in any significant impacts.  To the extent that the project could have some adverse environmental impacts, the EA lists a number of mitigation measures to be taken by TVA, including following

5

best management practices and environmental quality protection specifications, not using heavy equipment or vehicles in certain areas, performing additional field surveys with regard to a particular species of endangered bat, and, potentially, delaying construction if bats were found during those additional surveys.

Finally, the EA includes a section that addresses the comments received by TVA during the comment period, including comments challenging TVA's determination of project need and the Lanzalotta Report submitted by the plaintiffs, as well as comments pertaining to both project and route alternatives and to the environmental impacts of the project.

The plaintiffs filed this lawsuit on May 20, 2008, shortly after TVA issued the EA. The plaintiffs assert that the process by which TVA decided to proceed with construction of the proposed transmission line violated its obligations under the National Environmental Policy Act ("NEPA") and seek a declaratory judgment declaring TVA's actions unlawful under NEPA and its implementing regulations. Specifically, the plaintiffs allege that TVA acted arbitrarily or capriciously in determining that the project was necessary, in evaluating alternatives to the project, in evaluating alternative routes, and in evaluating the environmental impacts of the project and concluding that the project would not have any significant environmental impacts, a finding that rendered an EIS unnecessary under NEPA. The plaintiffs also seek a permanent injunction enjoining TVA from proceeding with construction of the transmission line until it prepares and circulates an EIS.

On the day the plaintiffs filed their lawsuit, another judge on this court held a hearing on the plaintiffs' request for a temporary restraining order preventing TVA from proceeding with construction of the transmission line. Although the court denied the plaintiffs' request, TVA

agreed to delay construction to provide the court with time to consider the plaintiffs' request for a preliminary injunction. Subsequently, on June 6, 2008, Judge Haynes issued an Order and Memorandum denying the plaintiffs' request for a preliminary injunction. (Docket Nos. 34 and 35.) In that ruling, Judge Haynes held that the plaintiffs had not demonstrated irreparable injury to the environment and that individuals in the Algood area would be subject to the risk of serious harm during the summer months if the existing power infrastructure were taxed beyond its capacity.

Following Judge Haynes' ruling, TVA proceeded with construction of the transmission line, and construction was completed on June 30, 2008. The line was energized on July 22, 2008 and remains in operation today.

## ANALYSIS

TVA has filed a motion to dismiss and for summary judgment arguing, first, that the plaintiffs' claims should be dismissed because the plaintiffs failed to serve TVA within 120 days of filing the Complaint and, second, that TVA is entitled to summary judgment with respect to the plaintiffs' claims. The plaintiffs have also moved for summary judgment.

**I.      Mootness**

As a preliminary matter, the court considers whether the plaintiffs' claims are moot in light of the fact that construction of the transmission line is now complete.

Under Article III of the United States Constitution, federal courts only have jurisdiction over actual cases and controversies—that is, over those cases that may affect the rights of the litigants. *Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 458 (6th Cir. 2004) (citing *Sw. Williamson County Cmty. Ass'n, Inc. v. Slater*, 243 F.3d 270, 276 (6th Cir.

7

2001)); *see also* U.S. Const. art. III, § 2.  When the issue presented by a case is "no longer 'live'" or when "the parties lack a legally cognizable interest in the outcome," the case is moot.  *Ford v. Wilder*, 469 F.3d 500, 504 (6th Cir. 2006) (citing *Powell v. McCormack*, 395 U.S. 486, 496 (1969)).  "A federal court has no authority to render a decision upon moot questions or to declare rules of law that cannot affect the matter at issue."  *Cleveland Branch, Nat'l Ass'n for the Advancement of Colored People v. City of Parma, Ohio*, 263 F.3d 513, 530 (6th Cir. 2001) (citing *Church of Scientology v. U.S.*, 506 U.S. 9, 12 (1992)).  Thus, courts have a continuing obligation to evaluate whether the claims before them are justiciable and must make the mootness inquiry at every stage of a case, regardless of whether the parties raise the mootness issue themselves.  *See Slater*, 243 F.3d at 276.

"The test for mootness is whether the relief sought would, if granted, make a difference to the legal interests of the parties."  *McPherson v. Mich. High Sch. Athletic Ass'n*, 119 F.3d 453, 458 (6th Cir. 1997) (citing *Crane v. Ind. High Sch. Athletic Ass'n*, 975 F.2d 1315, 1318 (7th Cir. 1992)).  Where a plaintiff seeks a declaratory judgment, a court making a mootness inquiry must evaluate "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 122 (1974) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)); *Coal. for Gov't Procurement*, 365 F.3d at 459 (quoting *McCorkle*, 416 U.S. at 122).  Moreover, the "completion of activity is not a hallmark of mootness."  *Coal. for Gov't Procurement*, 365 F.3d at 458.  Rather, "a case is moot only where no effective relief for the alleged violation can be given."  *Id.*  As federal courts "possess broad discretion to fashion equitable remedies," they

8

"may craft declaratory and injunctive relief designed to preclude a federal agency from acting in contravention of its statutory and regulatory authority." *Id.* at 460.

The plaintiffs allege that TVA violated NEPA in determining that the proposed transmission line was necessary, in failing to analyze alternatives to the line as a whole and to the route for the line in particular, and in concluding that the line would have no significant environmental impacts, a conclusion that excused TVA from preparing an EIS under NEPA. The plaintiffs assert that the construction of the transmission line required the destruction of over thirty-five acres of forest land, impacting the habitat for a number of species considered threatened or endangered by federal or state authorities, including the Indiana bat, the cerulean warbler, and the least trillium. The plaintiffs further assert that maintenance of the line will require the on-going felling of trees and use of herbicides to kill vegetation along the right of way. The plaintiffs seek a declaratory judgment that TVA violated NEPA and an injunction preventing TVA from proceeding with construction of the transmission line until it prepares an EIS.

The Sixth Circuit Court of Appeals has stated that the completion of a project does not necessarily moot a plaintiff's claim for declaratory relief and noted that federal courts may fashion declaratory and equitable remedies to provide relief to the aggrieved party.[4] *Coal. for*

---

[4]In several cases that pre-dated *Coalition for Government Procurement*, however, the Sixth Circuit Court of Appeals held that NEPA claims were moot where the challenged projects already were completed. *See Sierra Club v. U.S. Dep't of Agric. Rural Util. Serv.*, No. 99-5515, 2000 WL 1679473, at *3-4 (6th Cir. Nov. 2, 2000) (holding that plaintiff's claim alleging that defendant prepared a biased and inadequate EIS in violation of NEPA was moot where planned expansion of water treatment plant had been completed and poultry processing facility serviced by water treatment plant was in operation); *Neighbors Organized to Insure a Sound Env't, Inc. v. McArtor*, 878 F.2d 174, 178 (6th Cir. 1989) (holding that plaintiff's claim alleging that defendant failed to prepare an EIS in violation of NEPA was moot where planned airport expansion was

9

*Gov't Procurement*, 365 F.3d at 458. A number of other federal courts have likewise held, in

similar circumstances, that the completion of a project does not moot a plaintiff's NEPA claims.

*E.g.*, *Lemon v. Geren*, 514 F.3d 1312, 1315-16 (D.C. Cir. 2008) (claim not moot despite fact that

defendant had transferred closed Army base to private developer allegedly in violation of

NEPA); *West v. Sec'y of the Dep't of Transp.*, 206 F.3d 920, 925 (9th Cir. 2000) (claim not moot

despite fact that first stage of interchange project was compete); *Airport Neighbors Alliance, Inc.*

*v. U.S.*, 90 F.3d 426, 428-29 (10th Cir. 1996) (claim not moot despite fact that airport runway

was complete); *Columbia Basin Land Prot. Ass'n v. Schlesinger*, 643 F.2d 585, 591 n.1 (9th Cir.

1981) (claim not moot despite fact that transmission line was complete and operational); *but see*

*Springer v. U.S. Marshal*, 137 Fed. Appx. 657, 658 (5th Cir. 2005) (claim moot where

construction of detention center was complete); *Karst Envtl. Educ. & Prot., Inc. v. U.S. Envtl.*

*Prot. Agency*, 403 F. Supp. 2d 74, 82 (D.D.C. 2005), *aff'd* 475 F.3d 1291, 1298 (D.C. Cir. 2007)

(claim moot where defendant already awarded grant alleged to constitute violation of NEPA);

*One Thousand Friends of Iowa v. Mineta*, 364 F.3d 890, 893 (8th Cir. 2004) (claim moot where

construction of interchange was complete); *Bayou Liberty Ass'n v. U.S. Army Corps of Eng'rs*,

217 F.3d 393, 396 (5th Cir. 2000) (claim moot where construction of retail complex was

complete); *Knaust v. City of Kingston*, 157 F.3d 86, 88 (2d Cir. 1998) (claim moot where

construction of business park was complete); *Or. Nat. Res. Council, Inc. v. Bureau of*

*Reclamation*, No. 93-35591, 1995 WL 163303, at *2 (9th Cir. Apr. 7, 1995) (claim moot where

---

completed and operational); *City of Romulus v. County of Wayne*, 634 F.2d 347, 349 (6th Cir.
1980) (holding that plaintiff's NEPA claim challenging airport expansion was moot as "[t]he
activities which plaintiffs seek to enjoin are over, and we are not in position to prevent what has
already occurred").

dredging was complete); *Neighborhood Transp. Network, Inc. v. Pena*, 42 F.3d 1169, 1172 (8th Cir. 1994) (claim moot where construction of transportation project was complete).

Here, the court can provide effective relief for the plaintiffs in the event their claims succeed on the merits. For example, the court could order the removal of the transmission line, which would obviate the need for further use of herbicides and removal of trees and vegetation and would permit the area to return to its natural state, restoring the plant and animal habitats that were destroyed with the construction of the transmission line. As such, the court remains able to fashion effective relief for the violations of NEPA alleged by the plainitffs, and, thus, the plaintiffs' claims are not moot.

## II.      Service

TVA argues that the plaintiffs' claims should be dismissed pursuant to Rule 4(m) of the Federal Rules of Civil Procedure because the plaintiffs failed to serve TVA within 120 days of filing their lawsuit. Rule 4(m) provides:

> If a defendant is not served within 120 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Fed. R. Civ. P. 4(m). Rule 12(b)(5) provides for a motion to dismiss for insufficient service of process.[5] Fed. R. Civ. P. 12(b)(5).

---

[5]A motion to dismiss for insufficient process—that is, the form of process—is made pursuant to Rule 12(b)(4), while a motion to dismiss for insufficient service of process—that is, the manner or method of service—is made pursuant to Rule 12(b)(5). *See Phillips v. Tenn. Hotel Supply*, No. 1:04-cv-353, 2006 WL 897985, at *1-2 (E.D. Tenn Apr. 4, 2006) (discussing difference between motions made under Rule 12(b)(4) and Rule 12(b)(5)). Although ostensibly brought pursuant to Rule 12(b)(4), TVA's motion is more aptly characterized as one brought pursuant to Rule 12(b)(5).

The plaintiffs assert that they provided TVA with a copy of the Complaint, by email, prior to filing suit on May 20, 2008. However, as a result of oversight, the mistaken belief that this email delivery constituted effective service, or some combination thereof, the plaintiffs did not effectuate service upon TVA within the 120-day window mandated by Rule 4(m). Instead, the plaintiffs obtained an alias summons and served the alias summons and a copy of the Complaint upon TVA on October 20, 2008, shortly after TVA filed its instant motion to dismiss and for summary judgment. The plaintiffs request that the court consider this service effective, despite the fact that it took place outside the 120-day window for which Rule 4(m) provides. In the alternative, the plaintiffs argue that TVA waived its defense to insufficient service of process by virtue of its conduct in the course of litigating this suit.

When service is not effectuated within the 120-day window, Rule 4(m) permits a court either to dismiss the action or to order service to be made within a specified period of time, regardless of whether good cause is shown for the failure. In this case, as service has been effectuated and as there is no question that TVA was aware of the lawsuit from the outset, even participating in a hearing on the application for a temporary restraining order, the court sees no reason to dismiss the suit rather than simply extend, retroactively, the deadline for service to include October 20, 2008, the date on which service actually was effectuated. TVA's motion to dismiss for insufficient service of process will, therefore, be denied.

### III.     Motions for Summary Judgment

The court next turns to the parties' motions for summary judgment.

#### A.     *Summary Judgment Standard*

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Shah v. Racetrac*

13

*Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 431 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

      B.     *Statutory Framework*

      Congress enacted NEPA to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment" and to "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. Regulations promulgated by the Council on Environmental Quality ("CEQ Regulations") guide a federal agency's compliance with NEPA. *See* 40 C.F.R. §§ 1500.1 *et seq.* Additionally, TVA has adopted procedures to ensure its own compliance with NEPA. *See* Tenn. Valley Auth., Procedures for Compliance with the National Environmental Policy Act (1983).

      Under NEPA, federal agencies must include, "in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on – (I) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, [and] (iii) alternatives to the action." 42 U.S.C. § 4332(2)(C). This "detailed statement" is an Environmental Impact Statement, or EIS, and is required only where the proposed action would significantly affect the quality of the human

environment. 40 C.F.R. §1502.1; *Save Our Cumberland Mountains v. Kempthorne*, 453 F.3d 334, 338 (6th Cir. 2006) [hereinafter *SOCM*].

The CEQ Regulations provide guidance as to when a federal agency must prepare an EIS. *See* 40 C.F.R. § 1501.4. If it is unclear whether an EIS is required, an agency must prepare an Environmental Assessment, or EA, to determine whether an EIS is required. 40 C.F.R. § 1501.4(b); *Sierra Club v. Slater*, 120 F.3d 623, 635 (6th Cir. 1997). An EA is "a concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact" and includes "brief discussions of the need for the proposal, of alternatives . . . , of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9.

To determine whether a proposed action significantly impacts the environment, the agency must consider both the action's context and its intensity—that is, the severity of the action's adverse impacts. 40 C.F.R. § 1508.27; *Friends of Fiery Gizzard v. Farmers Home Admin.*, 61 F.3d 501, 504 (6th Cir. 1995). Facts that are relevant in evaluating an action's intensity include, among others, the action's potential effect on public health, whether it is related to other actions that have a cumulatively significant impact, the degree to which the action's effects are highly controversial, involve uncertain or unique risks, or may establish a precedent for future actions, and the degree to which the action may have an adverse effect on endangered or threatened species or the habitat of such species. 40 C.F.R. § 1508.27. If an agency determines, after preparing an EA, that the proposed action will not have any significant environmental impacts, the agency is not obligated to prepare an EIS and, instead, issues a

15

finding of no significant impact. *See* 40 C.F.R. § 1508.13; *Friends of Fiery Gizzard*, 61 F.3d at 504-05. "An agency's determination not to prepare an EIS must be reasonable under the circumstances, when viewed in the light of the mandatory requirements and the standard set by [NEPA]." *Kelley v. Selin*, 42 F.3d 1501, 1519 (6th Cir. 1995) (quotation and citation omitted).

The question of whether TVA violated NEPA is governed by the Administrative Procedures Act ("APA"). *SOCM*, 453 F.3d at 339. Under the APA, a court "shall hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also SOCM*, 453 F.3d at 339 ("We review an agency's environmental assessment, and its decision that an environmental impact statement need not be prepared, under the deferential 'arbitrary and capricious' standard." (citation omitted)). In evaluating whether an agency action was arbitrary or capricious under the APA,[6] courts rely on the administrative record that was before the agency at the time of the action. *See* 5 U.S.C. § 706; *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419-20 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

The scope of judicial review under the arbitrary or capricious standard is narrow, and a court may not simply substitute its judgment for that of the agency. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976). "The only role for a court is to insure that the agency has taken a

---

[6]The Sixth Circuit Court of Appeals has referred to the applicable standard as both "arbitrary *and* capricious," *e.g.*, *SOCM*, 453 F.3d at 339, and "arbitrary *or* capricious," *e.g.*, *Friends of Fiery Gizzard*, 61 F.3d at 506. Although courts often use the terms interchangeably and the precise wording is unlikely to affect the outcome of this case, the court herein applies the "arbitrary *or* capricious" standard, as the disjunctive is more consistent with the language of the APA.

16

'hard look' at environmental consequences." *Id.*; *see also SOCM*, 453 F.3d at 339 ("In deciding whether the agency acted arbitrarily, we will not substitute our judgment of the environmental impact for the judgment of the agency, but we will insist that the agency has, in fact, adequately studied the issue and taken a 'hard look' at the environmental consequences of its decision." (quotation and citation omitted)). In determining whether agency action was arbitrary or capricious, "the reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989) (citation omitted). However, "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Id.* at 378.

The plaintiffs' claims can be separated into three categories. First, they allege that TVA acted arbitrarily and capriciously in determining that projected energy demands in the region rendered the proposed transmission line necessary. Second, they allege that TVA failed to consider alternatives to the project as a whole and to the route in particular, arguing that TVA effectively pre-selected the route prior to issuing the EA. Finally, they allege that TVA violated NEPA in evaluating the environmental impacts of the proposed transmission line in the EA and in concluding that the proposed transmission line would not have any significant environmental impacts, a conclusion that excused TVA from having to prepare an EIS under NEPA.

C.      *Energy Need*

The plaintiffs claim that TVA acted arbitrarily and capriciously in evaluating the need for the proposed transmission line. According to the plaintiffs, TVA's definition of the purpose of

the project was unduly narrow, and TVA failed to consider a number of facts evidencing a decreased electricity demand on the local power infrastructure.

The EA states that TVA proposed to build the new transmission line to connect UCEMC's planned new Algood substation to TVA's existing transmission system and that the project was necessary because the existing infrastructure was projected to be operating at or above capacity by summer 2008. First, with respect to the plaintiffs' argument that the definition of the purpose of the project was too narrow, it is undisputed that UCEMC planned to build a new Algood substation and asked TVA to provide a transmission line to connect that substation to TVA's existing transmission system. Although the plaintiffs argue that agencies are precluded from "defining the objectives of their actions in terms so unreasonably narrow they can be accomplished by only one alternative (*i.e.*, the applicant's proposed project)," *see Colo. Env. Coalition v. Dombeck*, 185 F.3d 1162 (10th Cir. 1999), by the same token, agencies "are precluded from completely ignoring a private applicant's objectives," *Dombeck*, 185 F.3d at 1174-75. Here, TVA could hardly ignore UCEMC's request to connect its planned new Algood substation to TVA's transmission system, and TVA's definition of the purpose of the project necessarily was shaped by the scope and nature of UCEMC's request.

The plaintiffs further take issue with TVA's conclusion in the EA that the project was necessary, challenging the basis for TVA's projections that the existing power infrastructure—specifically, the existing West Cookeville 161-kV substation, the existing Algood 69-kV substation, and the existing 69-kV transmission line—would likely be operating at or above capacity by summer 2008. The EA provides that the existing West Cookeville substation had a capacity of 153 MVA and that the peak load on that substation in 2007 was

18

150.4 MVA.[7]  The demand on that substation in summer 2008 was projected to be either 155.3

MVA or 163.1 MVA, depending on whether anticipated increased loads were taken into account,

but, in either case, above the substation's capacity.  The EA further provides that the "firm

capability" of the existing Algood substation was 18.67 MVA and that the load on that

substation in summer 2007 reached 21.21 MVA, exceeding the substation's firm capability.

Finally, the EA provides that the existing transmission line was capable of handling 77.1 MVA

and that the projected load on the line during summer 2008 was expected to be 77 MVA,

equaling the line's capacity.

The plaintiffs challenge TVA's conclusion, on the basis of this data, that the existing

infrastructure would be operating at or above capacity by summer 2008, relying instead on the

Lanzalotta Report.  The Lanzalotta Report asserts that the capacity of the existing Algood

substation was actually higher than the 18.67 MVA claimed by TVA because the substation has

two transformers, each of which has a capacity of 18.67 MVA, and is connected to four other

substations.  Additionally, the Lanzalotta Report challenges TVA's evaluation of the historical

loads on the existing infrastructure, claiming that the data show decreases or only small increases

in the load on the existing West Cookeville substation, the existing Algood substation, and the

existing transmission line between 2003 and 2006.  However, the EA addressed at length these,

and other, issues raised by the Lanzalotta Report.  Specifically, the EA states that, though the

calculations in the Lanzalotta Report regarding the capacity of the existing Algood substation

were mathematically possible, they were not feasible from a "practical engineering standpoint."

---

[7]MVA stands for "megavolt-amperes" and is a unit of measure of electric power equal to
153,000,000 watts.  (Docket No. 3 Ex. 2 at 3.)

The EA further notes that the conclusions reached in the Lanzalotta Report were based on a comparison of lower peak winter loads to higher peak summer loads, that decreases in the loads observed between 2003 and 2006 were simply the result of a new substation that had been placed into service, and that the loads had increased and were approaching capacity in more recent years. The fact of the matter is that TVA explicitly considered the issues raised in the Lanzalotta Report and addressed them in the EA, which is all that it was required to do under NEPA.[8] *See Slater*, 120 F.3d at 634. Moreover, the mere fact that the plaintiffs disagree with TVA's conclusions does not create a triable issue with regard to their NEPA claims. *See Marsh*, 490 U.S. at 378 ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.").

TVA's projections of loads on the existing infrastructure were based, in part, on anticipated commercial, industrial, and residential development that was expected to add

_____

[8]In addition to relying on the Lanzalotta Report, the plaintiffs note that, in denying their request for a preliminary injunction, Judge Haynes opined that the evidence did not support TVA's contention that the existing West Cookeville substation and existing Algood substation would be operating at or above capacity by summer 2008. (Docket No. 34 at 48-49.) The conclusions reached in Judge Haynes' opinion, however, were based solely on the Lanzalotta Report and did not take into account the fact that the EA addressed those arguments. Moreover, findings of fact and conclusions of law made in the context of a ruling on a request for a preliminary injunction are not binding on the court at later stages of litigation. *Warshak v. U.S.*, 532 F.3d 521, 573 (6th Cir. 2008) (citing *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007)); *see also William G. Wilcox D.O., P.C. Employees' Defined Ben. Pension Trust v. U.S.*, 888 F.2d 1111, 1114 (6th Cir. 1989) ("Because of the lesser burden of proof required to support a motion for preliminary injunction as contrasted with a motion for summary judgment, a trial court's disposition of the substantive issues joined on a motion for extraordinary relief is not dispositive of those issues on the merits.").

20

approximately eight megawatts of new load in the Algood area.[9]  The plaintiffs allege that this

new development never materialized and, thus, that TVA was not justified in including the eight

megawatts of increased load associated with this anticipated development in making its

projections.  However, an agency inevitably must make its best estimate as to the future energy

needs of the local community.  Those estimates may not always be perfect, and they may, in

hindsight, constitute under- or over-estimates of a community's actual energy needs.  This court

cannot say, therefore, that TVA's decision to include anticipated development in its projections

of the load on the existing power infrastructure was arbitrary or capricious.  Further, although the

plaintiffs argue that TVA continued to rely on the projected eight megawatt increase even after

the anticipated development did not materialize, the evidence does not bear out that allegation.

Rather, the EA concludes that the existing West Cookeville substation would reach 155.2 MVA,

above its capacity of 153 MVA, *even if* the anticipated increased loads were not taken into

account.  Likewise, the EA states that the load on the existing Algood substation and the existing

transmission line would equal or exceed their capacities by summer 2008, without taking the

anticipated new development into consideration.

      In addition to challenging the data on which TVA based its evaluation of the energy

needs of the community, the plaintiffs argue that TVA did not take into account the fact that the

---

[9]The plaintiffs complain that TVA withheld information regarding the increased loads
related to anticipated development in the Algood area and only provided the data pursuant to
Judge Haynes' order in the course of this litigation.  There is no basis, however, for the
implication that TVA wrongfully withheld this information.  Both the draft EA and the final EA
included summaries of this data, which TVA redacted, having determined that the redacted
material was exempt from disclosure under the Freedom of Information Act.  *See Weinberger v.
Catholic Action*, 454 U.S. 139, 145 (1981) ("NEPA's public disclosure requirements are
expressly governed by FOIA.").

demand on the existing Algood substation would be reduced because a number of customers once served by UCEMC would be served by the City of Cookeville as a result of Cookeville's annexation of certain of UCEMC's territory. The plaintiffs further argue that TVA did not take into account the fact that certain loads on the existing West Cookeville substation were expected to be shifted to Cookeville's South Cookeville substation. Once again, however, the plaintiffs' allegations are unsupported, as the EA addressed these very issues, concluding that the reduction in load that would result from annexation would not sufficiently reduce the load on the existing Algood substation as to render service reliable and that, although some of the load might be redirected to the South Cookeville substation, any relief would be temporary, and the existing West Cookeville substation would soon return to operating at or above capacity.

In sum, a review of the EA makes plain that TVA carefully considered and addressed the objections raised by the plaintiffs and that there is no basis on which this court could conclude that TVA acted arbitrarily or capriciously in evaluating the need for the project.

D. Project and Route Alternatives

The plaintiffs next assert that TVA failed to consider alternatives to the project as a whole and failed to consider alternative routes for the proposed transmission line.

The Sixth Circuit has stated that "the range of alternatives that must be discussed under [NEPA] is a matter within an agency's discretion" and that an agency has "fewer reasons to consider alternatives when it prepares an environmental assessment as opposed to when it prepares an environmental impact statement." *SOCM*, 453 F.3d at 342 (citing *Friends of Ompompanoosuc v. Fed. Energy Regulatory Comm'n*, 968 F.2d 1549, 1558 (2d Cir. 1992)). Although the EA discusses at length the "Action Alternative," pursuant to which TVA would

22

construct the proposed transmission line to connect UCEMC's planned new Algood substation to TVA's transmission system, and the "No Action Alternative," pursuant to which TVA would not construct the proposed transmission line, the plaintiffs assert that this consideration of the alternatives was insufficient because NEPA prohibits a federal agency "from effectively reducing the discussion of environmentally sound alternatives to a binary choice between granting or denying an application." *See SOCM*, 453 F.3d at 345.

However, an examination of the EA reveals that TVA's consideration of the alternatives was hardly reduced to a "binary choice," as the plaintiffs claim. Rather, the EA demonstrates that TVA considered a number of alternatives in addition to the Action Alternative and the No Action Alternative, including upgrading the existing Algood substation, rebuilding the existing transmission line, supplementing the local power supply with emergency generators, redistributing the power supply, encouraging energy conservation, relying on distributed generation systems, building underground utility lines, and using existing rights-of-way such as highways. Rather than dismissing these alternatives "out of hand," as the plaintiffs allege, the EA provides a brief discussion of each alternative and articulates why each is not feasible based on considerations including cost, reliability, efficiency, timeliness, environmental risk, impact on residential and business areas, or failure to meet the supply needs identified by TVA. The rejection of alternatives for such reasons does not render TVA's decision arbitrary or capricious. *See Slater*, 120 F.3d at 637.

The plaintiffs also argue that TVA failed to consider the potential reintegration of UCEMC and annexation of its service area by the City of Cookeville, an option that, the plaintiffs claim, would have obviated the need for the proposed transmission line. Once again,

however, a review of the EA belies the plaintiffs' argument, as TVA explicitly addressed that issue in responding to comments submitted by members of the community. Specifically, the EA discussed the potential reintegration and annexation plan and noted that litigation was still pending with respect to the plan and that, in any case, implementing the plan would not necessarily remove any load from the existing Algood substation. Thus, there is no basis for the plaintiffs' claim that TVA failed to consider this alternative to the project.

In addition to arguing that TVA did not consider alternatives to the project as a whole, the plaintiffs also argue that TVA did not consider alternatives to the particular route for the proposed transmission line and that, in effect, TVA pre-selected the route for the proposed transmission line. The EA provides an extensive description of the process that TVA used to identify the route for the proposed transmission line. After collecting geographic information and data about natural features, cultural features, land uses, and transportation networks, TVA identified eighteen "route segments." These eighteen route segments were then combined to form seventeen different alternative routes, each of which were identified in the EA. TVA then applied forty-two distinct criteria, falling into four umbrella categories of engineering criteria, environmental criteria, land use criteria, and cultural criteria, to each of the seventeen alternative routes. TVA quantified and weighted the criteria and ranked the seventeen alternative routes both overall and with respect to each of the four types of criteria. At the conclusion of this analysis, TVA identified Alternative Route 1 as the "preferred route" with the least impact overall, in part because that route affected fewer property owners, did not cross through nearby wetlands, and did not conflict with underground utilities, despite the fact that it was the longest of the alternative routes and required the most acres of right-of-way. The EA also states that

24

Alternative Route 1 subsequently was altered to further reduce the project's impacts based on comments that TVA received from property owners, public officials, and environmental experts and on information from field surveys and other data sources.

Although the plaintiffs assert a host of objections to the manner in which TVA reached the conclusion that Alternative Route 1 was the preferred route for the proposed transmission line, none of the plaintiffs' objections suggest that TVA acted arbitrarily or capriciously in reaching that conclusion.[10] For example, the plaintiffs complain that Alternative Route 1 was not the highest ranked alternative with respect to environmental criteria. However, TVA's process clearly reflects an effort to balance a variety of considerations, and thus TVA ranked each alternative route with respect to the four types of criteria—engineering, environmental, land use, and cultural—and also distilled these rankings to obtain an overall ranking, which resulted in TVA's determination that Alternative Route 1 was, overall, the preferred route.[11]

---

[10]The plaintiffs note that, in denying their request for a preliminary injunction, Judge Haynes nevertheless stated that the plaintiffs had "a substantial claim" that TVA violated NEPA by pre-selecting the route. (Docket No. 34 at 2.) However, NEPA does not prohibit an agency from identifying a preferred alternative in the course of its analysis and, in fact, agencies are encouraged to do so by the CEQ regulations. *See Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1185 (9th Cir. 1997); 40 C.F.R. § 1502.14(e). Moreover, not only is Judge Haynes' ruling not binding at this stage of litigation, as discussed *supra* note 8, but also, contrary to the dicta that the plaintiffs had a "substantial" NEPA claim, Judge Haynes' ruling later states that "TVA clearly considered other routes" and concludes that "TVA reasonably considered the relevant alternatives to comply with NEPA." (Docket No. 34 at 43, 47.)

[11]Of the seventeen routes considered, Alternative Route 1 ranked second on engineering criteria, sixth on environmental criteria, second on land use criteria, and first on cultural criteria, giving it the highest overall ranking. The alternatives that ranked higher than Alternative Route 1 with respect to environmental criteria generally ranked far lower than Alternative Route 1 with respect to land use and engineering criteria, resulting in a lower overall rank for each of those alternatives.

25

The plaintiffs further attack TVA's process, including its selection and weighting of the forty-two criteria applied to each of the alternative routes, as subjective or otherwise arbitrary. However, it appears that TVA's process was exceptionally thorough and took into consideration a host of relevant considerations, environmental and otherwise, and there is no indication that TVA attempted to discount environmental considerations or otherwise manipulate its calculations to favor Alternative Route 1. Moreover, it was well within TVA's discretion to define the criteria for evaluating each of the alternative routes, and TVA appears to have done so thoughtfully and responsibly. Further, although the plaintiffs argue that the process was biased toward Alternative Route 1 because the other sixteen alternative routes all passed through nearby wetlands, thus presenting a greater risk of environmental impacts, this fact, if anything, supports TVA's conclusion that Alternative Route 1 was the preferred route. Finally, although the plaintiffs complain that TVA did not consider, among the seventeen alternative routes, either a route along an existing highway or a route along the existing transmission line's right-of-way, the EA did address those two alternative routes, rejecting the use of a highway right-of-way because it posed safety risks and would require the removal of existing homes and businesses and rejecting the use of the existing transmission line's right-of-way because it would require lengthy power outages, be very expensive, and impact existing homes and businesses.

As a last ditch effort, the plaintiffs argue that the process by which TVA determined that Alternative Route 1 was the preferred route did not constitute an "evaluation" of the alternatives, and that at least one of the other alternatives—such as that which ranked highest with respect to environmental criteria—should have been evaluated on par with Alternative Route 1 in the EA. This argument, however, ignores the fact that TVA did evaluate the seventeen proposed routes in

26

the process of drafting the EA and in discussing Alternative Route 1 in the EA.  TVA identified

Alternative Route 1 as the preferred route on the basis of criteria that were clearly delineated and

consistently applied, consistent with its obligations under NEPA.  *See SOCM*, 453 F.3d at 347

(noting that, "while the agency did not identify additional alternatives in so many words in the

environmental assessment, it plainly considered alternatives during the administrative process").

This most certainly was not arbitrary or capricious action on TVA's part.

   E. *Environmental Impacts*

  Finally, the plaintiffs argue that TVA did not take a sufficiently "hard look" at the

environmental impacts of the project and violated NEPA by making a finding of no significant

impact, a finding that obviated the need to prepare an EIS.

  According to the plaintiffs, TVA failed to assess adequately the environmental impacts of

the project, to the extent that TVA did not consider the potential for contamination of

groundwater in the area.  However, the EA reflects that TVA did, in fact, consider this issue at

length.  Specifically, the EA acknowledged the likelihood that a number of private wells existed

within the vicinity of the proposed transmission line and noted that groundwater could be

impacted if herbicides and fertilizers contaminated nearby sinkholes and caves.  However, the

EA provides that herbicides and fertilizers would not be used in areas where sinkholes and caves

occur and that, to the extent that herbicides and fertilizers were used in other areas, TVA would

take routine precautionary measures with respect to their use.  TVA concluded, therefore, that

impacts to groundwater from the project would be insignificant.[12]  The EA makes clear that TVA

_____

    [12]The plaintiffs argue that an agency may only consider mitigation measures to make a
finding of no significant impact where those mitigation measures are imposed by statute or
regulation or are submitted by the agency as part of the original proposal.  *See Davis v. Mineta*,

did not act arbitrarily or capriciously in this regard but, rather, thoughtfully considered this issue, examining not only the presence of private wells in the area and the possibility of groundwater contamination through sinkholes and caves, but also explaining the basis for its conclusion that the risk posed was insignificant.

The plaintiffs also assert that the project would adversely affect a number of threatened and endangered species, including the cerulean warbler, which is considered "in need of management" by the state of Tennessee, the least trillium, which is considered "endangered" by the state of Tennessee, and the Indiana bat, which is considered "endangered" by the federal government, and that TVA erred in concluding otherwise. The EA states that TVA employed qualified biologists to conduct field surveys to evaluate the impacts of the project on threatened and endangered species and concluded that the effect on these species would be insignificant. First, with respect to the cerulean warbler, TVA concluded that only a small portion of the suitable habitat in the region would be affected by the project. As for the least trillium, TVA's biologists did not observe this species or its habitat in the course of the surveys. Further, although the plaintiffs complain that the surveys were not conducted during the proper time of year to observe the least trillium, TVA addressed this very issue in the EA, noting that the area was surveyed not only for the species itself but also for suitable habitat and that it took into

---

302 F.3d 1104, 1125 (10th Cir. 2002) ("As a general rule, the regulations contemplate that agencies should use a broad approach in defining significance and should not rely on the *possibility* of mitigation as an excuse to avoid the EIS requirement."). However, TVA's commitment to avoid the use of herbicides and fertilizers in the vicinity of sinkholes and caves constitutes part of its original proposal and an explanation of its reasoning, rather than a mitigating measure, and thus TVA was not precluded from taking that commitment into account in determining that the risk of groundwater contamination posed by the project was insignificant.

28

consideration the presence of suitable habitat in evaluating the potential environmental impacts of the project.

With respect to the Indiana bat, TVA's biologists conducted a survey and did not find any indication of the presence of this species, although they did find certain areas that could provide low- or moderate-quality habitat for the species. The EA therefore provided that TVA would conduct a second survey for the Indiana bat and, if necessary, delay construction of the transmission line until those bats had left the area to hibernate for the winter so as not to affect the bats or their habitat. Despite the plaintiffs' argument to the contrary, the EA reflects that TVA took a hard look at the impacts of the project on threatened and endangered species, including the Indiana bat, by conducting field surveys for those species and their habitats, by providing for additional surveys where necessary, and by addressing, in the EA, comments on these very issues raised by members of the community.

Finally, the plaintiffs complain that TVA did not adequately consider the extent to which the project is related to other actions with a cumulatively significant impact or the extent to which the project is highly controversial, both of which are factors relevant to an agency's consideration of the significance of a project's impacts under NEPA and the CEQ Regulations. *See* 40 C.F.R. § 1508.27. Neither of these arguments saves the plaintiffs' claims, however. First, TVA explicitly considered the make-up of the surrounding area and the development trends in the region, noting that the region boasts more than a million forested acres and that the incremental loss of approximately thirty-five acres of forest land that would result from the project was insignificant.

29

Additionally, there is no indication that TVA failed to consider the controversy surrounding the project or that its decision to proceed with the project was arbitrary or capricious on this account. In fact, TVA took steps to address the controversy by holding an open house and by responding carefully in the EA to the comments it received from members of the community. Moreover, the plaintiffs' objections to the project do not constitute the type of substantial dispute—that is, they do not constitute a dispute as to the reasonableness of TVA's conclusions, *see, e.g.*, *Nat'l Parks & Conservation Assoc. v. Bobbitt*, 241 F.3d 722, 736 (9th Cir. 2001)—that would permit a finding that TVA acted arbitrary or capriciously in this regard.

In sum, a close examination of the record on which TVA based its conclusion to proceed with construction of the proposed transmission line reveals that TVA took a hard look at the environmental impacts of the project, including the project's impacts on groundwater and threatened and endangered species, and did not act arbitrarily or capriciously in deciding to proceed with the project.

## CONCLUSION

For the reasons discussed herein, the defendant's Motion to Dismiss and for Summary Judgment will be granted and the plaintiffs' Motion for Summary Judgment will be denied.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

Case 2:08-cv-00040   Document 69   Filed 05/18/09   Page 30 of 30 PageID #: 1833